DANIEL S. MILLER AND SHEPHARD KNAPP, *Trustees, &c., v.* THE RUTLAND AND WASHINGTON RAILROAD COMPANY ET AL.

[IN CHANCERY.]

*Mortgage. Foreclosure. Trustees. Corporation. Bond. Railroad.*

A railroad company being in want of funds to build its road, authorized its president to issue bonds secured by a mortgage on the road and its franchises. The president executed an instrument reciting his authority, and proceeding in his name as president to mortgage the road, &c., but he signed the instrument in his own name simply. Afterwards, the company issued two sets of bonds, secured by second and third mortgages in due form. The first bonds not having been paid when due, the trustees filed a bill to foreclose the mortgage, and thereupon it was *held*, that

The corporation had a legal competency to pledge its credit for the procurement of rails for its road, and to secure payment by a mortgage.

The instrument executed by the president in pursuance of the votes of the directors, although intended to take effect as the deed of the corporation, yet not being executed by or in the name of the corporation, cannot operate as its deed.

The transaction in a court of equity is to be regarded as an *equitable mortgage*, and thus entitles the complainants, the holders of what was intended to secure the payment of the first mortgage-bonds, to their full right in equity to the said mortgage which was intended to be given.

The trustees under the second and third mortgages were the agents of the holders of bonds under such mortgages, and actual notice to said trustees of the equitable first mortgage, was notice to the bondholders, who therefore took their bonds subject to all the legal consequences of the existence of the said equitable first mortgage.

The corporation had sufficient right or interest in the subject-matter of the mortgages upon which said mortgage would lawfully be operative. The corporation was competent to convey by mortgage what the mortgage purports to cover and convey, viz., the road and its franchise, as now construed. The mortgage was designed to take effect upon the road, as it should exist under the rights of the corporation, at the time the mortgagees should succeed to its rights by virtue of the due enforcement of the mortgage.

There is no need of a preliminary decree for the reformation of the deed, and the court can give immediate effect to the instrument, as if it were reformed in pursuance of a decree of equity. The court, therefore, grant a decree of foreclosure.

PETITION for the foreclosure of a mortgage. The Rutland and Washington Railroad Company, chartered in 1847, surveyed and located a railroad pursuant to its charter, and put it under contract for its entire completion, including land damages.

The contractors were to receive in payment shares of the capital stock at par, for all but $100,000., which sum was to be paid in money. They proceeded with the work, and when it became necessary to procure rails, it was found that the capital stock could·not be made productive of the necessary means.

Thereupon the directors voted to modify the contracts by making provision for the issue of of $250,000. of bonds, for the purpose of procuring the necessary iron, to be secured by mortgage upon the road and its franchises; which bonds the contractors might receive by substitution for an equal amount of stock; it having been ascertained by the officers of the company that such bonds would be received by the dealers in payment for the iron; and one of the directors, as agent of the contractors, negotiated the purchase.

Bonds were issued accordingly, pursuant to votes of the directors of May 4th and June 25th, 1850, as follows.

Vote of May 4th. *Resolved,·*That the President and Treasurer, of said Company, be instructed to issue bonds, predicated upon a mortgage of their road, for a sum not exceeding two hundred and fifty thousand dollars; said bonds only to be issued for the purpose of ironing the road, and after the grading shall have so far progressed as to justify the purchase of the rails.

*Resolved,* That J. Bradley and M. Clark, be a committee to procure the necessary blank forms for said bonds, to appoint Trustees, if it be deemed proper to negotiate bonds through Trustees, and to take such other steps as may be judged proper to carry out the purposes stated.

*Resolved,* That said bonds shall have from five to fifteen years to run, made payable at such time, and in such place and manner as shall be deemed expedient.

Vote of June 25th. *Resolved,* That M. Clark, the President of this Company, be appointed attorney and agent to execute a mortgage of the road and its franchise to Daniel S. Miller,

Shepherd Knapp, of New York, as Trustees, to secure the payment of bonds, not exceeding two hundred and fifty thousand dollars, authorized to be issued by resolutions passed May 4th, last.

*Resolved,* That the President aforesaid, be instructed to mortgage the lease of that part of the Troy and Rutland Railroad, given them on the 24th instant, in pursuance of a contract made the 5th of March, 1850.

*Resolved,* That the said President be fully empowered to execute any further assurance or contract to said Trustees proper to be made to carry out the object contemplated by said mortgage.

In the first annual report of the directors of said railroad company, made in 1851, the directors referred to the fact that these bonds were issued, pursuant to recommendations of the stockholders, and that iron, sufficient for the road, had been purchased by these bonds, &c. This report was presented and read by the president, and accepted at a meeting of the stockholders, February 27, 1851.

These bonds are again referred to in the second annual report in 1852, in a statement of the financial condition of the corporation, and of the cost of the road and furniture, as having been expended to defray the cost of the road, except $25,000. of them.

At a meeting of the stockholders March 16th, 1852, this report was also presented and read by the president, and accepted.

Subsequent to this, December 10th, 1852, the corporation issued $550,000. of other bonds, and secured them by a mortgage upon the road, and franchises and property belonging to it; $250,000. of which were designed by the parties to the transaction, to be used in retiring the first mortgage, and the residue to paying the other indebtedness of the company. The first mortgage bondholders did not assent to this arrangement in substitution for the bonds then held by them.

One of the trustees, Daniel S. Miller, in the first mortgage, was also one of the trustees in the second mortgage.

At a meeting of the directors in October 1852, the directors passed the following resolution:

*Resolved,* That the President be authorized to dispose of all the new issue (or second mortgage) bonds, and ninety cents upon the dollar, to James W. Baldwin, after having set aside or reserved as many as shall be sufficient to pay up the first mortgage bonds outstanding.

Signed,      GEORGE W. STRONG, Clerk pro. tem.

And March 14, 1853, the following resolution was offered and adopted :

*Resolved,* That the President and Treasurer be authorized to exchange the mortgage bonds, bearing seven per cent. for the mortgage bonds bearing six per cent. interest at par.    Attest.

Signed,      GEORGE W. STRONG, Clerk, pro. tem.

The seven per cent. bonds referred to were the second mortgage bonds, and the six per cent. the first mortgage.

And at a stockholders meeting, April 21, 1853.   It was

*Resolved,* That the stockholders approve of the making of the mortgage, dated the 15th day of December, A. D. 1852, which was given to secure five hundred and fifty thousand dollars of seven per cent. bonds ; twohundred and fifty thousand dollars of which shall be appropriated expressly for the redemption of the six per cent. bonds, dated July 1st, 1850.

In 1858, the said railroad company made a lease of their road Thomas H. Canfield for the yearly rent of $70,700.  Of this sum $15,000. was made payable to the bond or note-holders under the first mortgage, so called, for the payment of the annual interest to accrue thereon.

In 1855 the corporation made another mortgage, securing an issue of $1,300,000. of other bonds ; the purpose of which was, by substituting the new bonds for the former issues, thereby to retire both the prior mortgages ; and also to pay any other existing indebtedness of the company.

Most of the creditors and bondholders, except those holding the first mortgage bonds, came into the arrangement.   The holders of the first bonds declined to do so.

The instrument made by Clark in pursuance of the resolutions of May 4th, and June 25th, 1860, recited those votes and proceeded as follows :

Know ye, therefore, that I, Merritt Clark, as I am the President of said company, as well by the power and authority vested in me by the vote aforesaid as in consideration of the sum of two hundred and fifty thousand dollars to the use of said corporation, well and truly paid, the receipt whereof is hereby acknowledged, do by these presents, give, grant, bargain and sell unto the said trustees and their successors, (to be by themselves nominated and appointed,) the premises herein above and in said vote mentioned.

To have and to hold the said granted and bargained premises, to them the said trustees, their heirs, assigns and successors forever to their own use.

And I, the said Merritt Clark, do hereby covenant to and with the said trustees, and their successors that I am duly authorized and empowered to sell and convey the said premises to the said trustees in manner and form aforesaid, and that I will and my heirs, executors and administrators shall warrant and defend the same to the said Miller and Knapp, trustees, their heirs, assigns or successors, against the said corporation, and all persons claiming from, by, through, or under me, the said Clark, but against no other persons.

The condition of the foregoing is such, that if the said corporation shall pay or cause to be paid to the said trustees, or the legal holders, two hundred and fifty bonds of one thousand dollars each, issued by said corporation, bearing six per cent. interest, payable semi-annually,—signed by H. Clark, Treasurer, and M. Clark, President, having interest warrants annexed, which, as well as the bonds, are payable at the Mechanics' Bank, New York, which bonds fall due in sums of twenty-five thousand dollars yearly for ten successive years, commencing July 1, 1855, and ending July 1, 1864, and bear date July 1, 1850,—then this deed shall become void,—otherwise it shall remain in full force. In witness whereof, I have hereto set my hand and seal this 26th day of June, A. D. 1850.

In presence of 〕
W. I. BROWN, 〉              M. CLARK,    [L. S.]
A. L. BROWN, 〕

Miller et al. *v.* R. & W. R. R. Co. et al.

STATE OF VERMONT, } RUTLAND, June 26, 1850.
*Rutland County, ss.*

Then personally appeared the above named Merritt Clark, the President of the above named Rutland and Washington Railroad Company, and acknowledged the foregoing instrument to be his free act and deed and the free act and deed of said corporation.

Before me, A. L. BROWN, Justice of Peace.

To this instrument was attached the following certificate :

We have examined the foregoing deed, and hereby certify that it is drawn in the proper form, and is duly executed according to the laws of the State.

PIERPOINT & WILLIAMS,

Attorneys at Law, Rutland, Rutland County, Vt.

CH. K. WILLIAMS,

Attorney at Law, Rutland, Vt.

Rutland, Vt., June 26, 1850.

This instrument was recorded on the day of its exection and the day following in the Town Clerk's Offices of Rutland, Ira, Castleton, Poultney, Pawlet, and Rupert.

The bonds, thus issued and secured, not having been paid as provided, this suit is brought to enforce the security by foreclosure. The other material facts are stated in the progress of the opinion.

This cause was heard by POLAND, CHANCELLOR, previous to the September Term, 1861, Rutland County, Court of Chancery, and the decree was made in November following, but the clerk was ordered to enter the decree as of that term and notify the solicitors, and if a motion for an appeal was filed, to enter the appeal as of the September Term. In this decree the Chancellor declared it to be his opinion that the orators had the right to hold the property under their mortgage ; that the mortgage must be regarded as defectively executed, but it had been recognized and ratified by the company in so many different ways that they could not now avoid it ; that the trustees of the second mortgage had full notice of the existence of the orators' mortgage, and were therefore subject to it as much as the company, and notice to the trustees must affect all the holders of bonds under the mortgage.

But while this was substantially his opinion, yet in order to facilitate a final determination of the cause, in case of an appeal, and in the meantime to secure the best interests of all parties, and for other reasons mentioned, the Chancellor made a *pro forma* decree dismissing the bill; from which decree the orators appealed.

The cause was argued at the General Term of the Supreme Court, November, 1862, and held by the court for advisement till the February Term, 1864, of the Supreme Court in Rutland County, at which BARRETT, J., delivered the opinion of the court.

*E. W. Stoughton* and *H. E. Stoughton*, for the orators.

I.  The corporation had power to mortgage its road and franchises to complainants, at the date of the instrument in question. It has been, it is believed, uniformly conceded, that railroad corporations may mortgage personal property belonging to them; but it is insisted, that they have no power, unless expressly authorized so to do, to mortgage, either their road-bed, track, or franchises.

1.  The Rutland and Washington Railroad Company had power, by the true construction of its charter, which contains no clause of prohibition, to convey by mortgage its real and personal property.  As a general rule every corporation has the absolute right to convey all the property it is authorized to acquire.  2 Kent's Com., 281.  Angel & Ames on Corp'ns; §§ 187, 191–2. Redfield on Railways, § 235 and cases cited, and notes. 181. *Barry* v. *Merchants' Exchange Company*, 1 Sandford Ch. 280. 15 N. Y. 62 to 66, 169, 219 to 222, 262, 267, 270.  Redfield on Railw., § 235 and cases there cited.  See Act of 1857.  The policy of the state is indicated by the Act of Nov. 9th, 1850, authorizing and confirming mortgages, &c.

2.  Independent of this incidental or common law power, the mortgage was authorized by the Revised Statutes of Vermont, empowering Corporations to convey all their property by vote. See Angel & Ames on Corp., 282, 283, as to what is the "vote" of a corporation.

3. The mortgage, although dated and recorded in June, 1850, did not become operative as a security, until the bonds it was intended to secure were issued by the corporation; and these, the proof shows, were first delivered on the 24th of February, 1851.

II. The execution of the instrument in question was duly authorized by the Rutland and Washington R. R. Company.

1. The directors of that corporation had, by its charter, power to mortgage its property. They did not derive their authority from the stockholders, but from the law. Angel & Ames on Corp., 221, 231, 280, 299; 5 Wend. 590; 35 Eng. C. L. and Eq. 178; Redfield on Railways, p. 408; 30 Vt. 159.

2. But the corporation itself authorized the issue of $250,000. of bonds, and the execution of the mortgage in question upon the road and franchises to secure their payment.

3. The corporation, by its agreement with the contractors, and the directors, by their resolutions of May 4th and June 25th, 1850, empowered the president of the company to issue the bonds, and execute and deliver a mortgage upon the road and franchises to secure their payment; and the instrument in·question was made and delivered as such mortgage.

III. The instrument so made operated as a mortgage, according to its terms, from the time of its delivery as such. Angel & Ames on Corp., 252a, 253, 293, 296; 11 Eng. C. L. and Eq. 565; 3 Johnson 226; 5 Wend. 590; 2 Story Eq. Plead. 1018. *McDaniels* v. *Flower Brook M. Co.,* 22 Vt. 284. It is submitted with confidence, that under the Revised Statutes authorizing any public or private corporation to convey real estate by an agent appointed by vote for that purpose, the seal of the corporation to the conveyance is unnecessary. Angel & Ames on Corp. § 193; 19 Vt. 253; *Hart* v. *Gage,* 6 Vt. 170; *Woodbridge* v. *Proprietors of Addison, ib.* 204; *Thorndike* v. *Barrett,* 3 Greenleaf 380. And it has been repeatedly ratified and confirmed as a mortgage, long before the execution of either of the instruments under which the defendants claim.

1st. The Act of Nov. 9th, 1850, operated as such confirmation. Redfield on Railways, 577–8, Note.

2d. The instrument has been often and solemnly ratified and

confirmed by the acts and resolutions of the company itself; and and for the law as to what constitutes such ratification, the court is referred to Angel & Ames on Corp., 238, 240, 284, 291, 304; 2 Vt. 425; 2 Vt. 110; 24 Vt. 260, 266; 20 Vt. 425; 30 Vt. 159; 8 Cowen 60; 3 Cowen 281; 5 Hill 107; 5 Hill 137; 12 Johnson 300. The corporation having, upon the faith and credit of this mortgage, obtained and used, without objection thereto, the iron for its track, should be estopped from asserting its invalidity. 29 Vt. 93; 27 Vt. 110; Redfield on Railw., p. 408; 25 Eng. C. L. & Eq., 178.

V. If by reason of any defect in the form of execution of this instrument, it is held not to be a mortgage at law as between the parties to it, then clearly it is a contract for one, and good in equity as such, not only between the parties, but as against all claiming as subsequent incumbrancers with notice. 19 Vt. 269; 29 Vt. 263; 2 Story's Eq. J., § 1020; 1 Story's Eq. J., §§ 395 to 400, 715; 6 Johns. Ch. 398, 406; 14 Vesey, 426; 2 Vesey, 437; 16 Vesey, 249; 17 Vesey, 433; 25 Barb. N. Y. S. C. 302, 305.

VI. If we assure that the instrument sought to be foreclosed is not a registered deed, and that therefore the rights of subsequent incumbrancers can only be affected by showing that they had prior notice of its existence, then the proof is that they had such notice.

1st. Notice to the trustees named in the subsequent deeds is sufficient, without proving notice to the bondholders. *Pierce* v. *Emory*, 32 N. H. R., 484; Redfield on Railw., 576, 582, Note; *Willes* v. *Greenhill*, Law Times, New Series, 5th vol., p. 335. And notice to one of several trustees named in a deed, is notice to all. See *Willes* v. *Greenhill*, above cited; Angel & Ames on Corp., 306.

2d. Miller, one of the trustees named in the second mortgage, of course had notice of the first, and the others, Corning and Sherman, also had notice.

VII. The instrument in question will be adjudged a conveyance of all it purports to grant, although the Company at its date had not acquired title to the entire track by the payment of the land damages therefor.

1st. It is conceded that prior to the execution of the second

mortgage, such title had, with but trifling exceptions, been perfected; and these exceptions have since been supplied by those claiming to act under the third mortgage, and who had notice of the first.

2d. Upon the payment of these land damages by the Company, or by those acting under the third mortgage, the title thus perfected became subject to the instrument in question, whether it be considered a legal or equitable mortgage, or only an agreement to execute one. (1.) This is and ought to be so upon the doctrine of estoppel and eqitable trusts; 25 Vt. 635; 24 Pick. 324; 13 N. H. R. 389; 13 Vt. R. 150; 3 Cushing, 224; Redfield on Railw. 109, and Notes. And see cases cited under the 6th Point. (2.) It is so upon the authority of adjudged cases. *Willink* v. *Morris Canal* and *Banking Company*, 3 Green's Ch. R. 377; Redfield on Railw. 589, and notes.

*M. L. Bennett*, for the defendant trustees.

I. The company, at the time of the execution of this pretended mortgage, had no railroad bed to mortgage. Nothing can be mortgaged which does not belong to the mortgagor, at the time of the execution of the mortgage. *Pierce et al.* v. *Emery et al.*, 32 N. H. 505-506; *Winslow* v. *Merch and Ins. Co.*, 4 Met. 306; *Jones* v. *Richardson*, 10 Met. 488; *Moody* v. *Wright*, 13. Met. 17; 8 Barber 102; 10 Ohio N. S., 377; 23 How. U. S. 117–127–8; 3 Bacon Ab. Title, Grant D, p. 332. The Corporation, on the 26th of June, 1860, had no title of any kind, to a large part of the land along its line, the road being merely located.

II. Our second proposition is: That if the railroad company had a road, they had no power to alienate it, or their franchise, prior to the Act of 1850.*

III. We assume, as our third general proposition, (if we are not sustained in the foregoing propositions,) that no mortgage has ever been in fact executed *by the company*, which can, as a mortgage, have any binding effect against the company; and

---

*NOTE. This point is presented at length by Mr. Phelps in the next brief, therefore the argument under it in this brief, is omitted.

much less against subsequent bond-holders.    This instrument is but the private deed of Clark.    The grant proceeds from Clark, and not from the railroad company; the covenants to ensure title are by Clark, and it is signed by Clark, and the seal affixed by him is his own private seal.    The objections, then, to this mortgage are not of a technical character, but go to the very character, substance and effect of the instrument itself.    The following cases are ample to show that the deed in question is the private or individual act of Clark, and that it is *void;* not voidable against the company: *Lessee of Clark et al.* v. *Courtney et al.,* 5 Peters 320–349; *Frontine v. Small,* 2 Ld. Ray. 1418; 4 Bacon's Abr. Leases p. 140; *Bogart et. al.* v. *De Bussy,* 6 John 94; *Fowler* v. *Shearer,* 7 Mass. 14; *Elwell* v. *Shaw,* 16 Mass. 42; *Hatch* v. *Barr,* 1 Ohio 390–395; *Wheelock* v. *Moulton et al.,* 15 Vt. 519–521; *Isham, Adm'r* v. *Bennington Iron Co.,* 19 Vt. 230; *Randall* v. *Van Vechten,* 19 John. 60; *Bank of Metropolis* v. *Guttschink,* 14 Peters 19.

IV.    The vote of the directors, of the 25th of June, 1850, could not confer upon Clark any power to execute a mortgage of the railroad and franchise of the company; not even if the company themselves had such a power.    If the corporation had such powers, the directors could not confer it without a vote of the stockholders.    Comp. Stat. 384, Sec. 3; *Isham* v. *B. Iron Co.,* 19 Vt.    It is unquestionably true, if the company could confer the power on Clark to execute this mortgage, and it was defectively conferred by the directors, the stockholders might ratify the act; but this ratification, as against the subsequent bondholders, must be before their title intervened; and they must also have had notice of this ratification.    Otherwise, as to the subsequent bondholders, it would be a *nullity*.    So if the corporation could not confer the power to make a mortgage, any subsequent ratification by the stockholders will always remain a nullity as to everybody.

V.    By this instrument no *equitable mortgage* is created against the company, and much less against the subsequent bondholders. When the legal estate is conveyed to the mortgagee, and a day of forfeiture at law is specified, the mortgage is then termed a

perfect mortgage. If wanting in one or both of these particulars, then, at most, it is but an imperfect security, or in other words, an *equitable lien*. But we claim that no *equitable lien* can be created upon real estate, by means of any contract in writing, unless such contract does, at least, embody what will amount to an *executory agreement* to give a mortgage, by the party from whom the *lien* is to proceed. This instrument, whether you regard it as a simple contract in writing, or as a specialty, is throughout the sole contract of Clark. Can any one claim that an action can be predicated on this instrument against the company? (See Story's Agency, Sec. 276). *Stackpole* v. *Arnold*, 11 Mass. 27; *Arfridson* v. *Ladd*, 12 Mass. 173; *Andrews* v. *Estus*, 11 Maine 267–270; *Bradlee* v. *Boston Gas Co.*, 16 Pick. 347–350; *Rice* v. *Gove*, 22 Pick. 161; *Savage* v. *Rix*, 9 N. H. 269; *Minard* v. *Mead*, 7 Wend. 68. And further: Clark was appointed a special agent to make a mortgage. His duty was ministerial, and his powers must be strictly pursued; to make an executory agreement, for a mortgage, was not within his powers. The *power* must be strictly pursued. *Daniels* v. *Adams*, Amb. 495; *Clinan* v. *Cooke*, 1 Sch. & Lef. 32; *White* v. *Cuddon*, 8 C. & F. 766; *Manser* v. *Back*, 6 Hare 443; Paley on Agency 208.

VI. This being clearly the sole private contract of Clark, cannot be controlled *by parol* in equity, any more than at law, unless upon the ground of *fraud or mistake*. No fraud is pretended. Is there any such *mistake*, that will enable this court to reform this contract, and turn it into one against the company? It seems to us to be impossible to make this a mistake of anything else than a *mistake of law, and ignorance of law does not affect agreements, nor excuse from the legal consequences of particular acts, even in courts of equity.* Adams' Equity 410. We are not to inquire *what the instrument, executed by Clark, was intended to mean, or how it was intended to operate, but what it was intended to be.* And it cannot be claimed, but what this document has all, and the *identical* provisions in it, which the parties intended it should have, and no more; and expressed in the *precise and very language* which they intended and understood them to be expressed in. The views of our own court

upon this question have been very definitely expressed in a number of cases.    (See *McDaniels* v. *Bank of Rutland,* 29 Vt. 239, and in other cases).    32 Maine 474 ; 1 Peters 15 ; 12 Peters 55 ; 9 Barb. 532 ; 10 Barb. 9 ; 1 John Ch. 512 ; 2 John Ch. 60 ; 6 Rand 594 ; 2 Green Ch. 498 ; 25 Vt. 608.

VII. If this was such a mistake as a court of equity could correct, still in no case should such court reform a written instrument, upon parol evidence, upon the ground of mistake ; and decree a specific performance with the variation when a statutory provision intervenes.    To do so, is nothing less than to repeal the statute ; and to make that pass by parol, which the statute declares shall not.    *Wollam* v. *Hearn* and n. 2 Lead. Cases in Equity, Part 1, 571 ; *Osborn* v. *Phelps,* 19 Conn. 63 ; *West-brook* v. *Harvison,* 2 McCord 112 ; *Elder* v. *Elder,* 10 Maine 80 ; *Miller* v. *Chetwood,* 1 Green. Ch. 199 ; *Best* v. *Stow,* 2 Sandf. Ch. 298 ; *Nurse* v. *Lord Seymour,* 13 Beav. 254 ; *Clinan* v. *Cooke,* 1 Sch. and Lef. 22–38–39 ; *Higginson* v. *Clowes,* 15 Vesey 516 ; *Winch* v. *Winchester,* 1 Vesey and Beames 378 ; *The Attorney-General* v. *Stilwell,* 1 Younge and Col. 559 ; *Ok'e* v. *Whittaker,* 2 Phillips 338 ; *Churchill'* v. *Rogers,* 3 Monroe 81.

VIII. The orators cannot succeed, upon any supposed ground of ratification, especially against subsequent bondholders.    An *imperfect deed* may be *confirmed,* and then it may have the effect of a registered deed, as to all parties having notice of its confirmation at the time their right attaches.    The paper *purports to be the mortgage of Clark,* and such it is in law, and not an *imperfect* mortgage of the Company ; as to the Company, it is an absolute nullity.    And *it is not to be varied by parol.*    The most that a *ratification* can do, is to make an instrument *what it professes to be* on its face.    *Hood* v. *N. Y. & N. H. R. R. Co.* 22 Conn. 502 ;   *Isham* v. *Ben. Iron Co.* 19 Vt. 250–251.    But there was no *ratification* as matter of fact.

IX. Going upon the ground that the first class of bondholders have a prior equity, which this court can recognise ; still as we have the legal title, we must prevail, unless the bondholders under the subsequent mortgages are chargeable *with notice.**

X. If the orators in the final opinion of the court, shall have

*The question of notice is fully argued and cases cited in Mr. Phelps, brief.

made out a prior equity against the subsequent bondholders, it is of that uncertain character, so much dependant upon the exercise of the discretionary powers of a court of equity, in decreeing a reformation of a written contract, or rather the turning Clark's contract into one against the company, and of such exceeding doubtful validity, that subsequent purchasers, for value, were not bound to regard it even upon notice, and especially after so great negligence and delay, as the orators are chargeable with in this case.

XI. Our next general proposition is, that if the orators have not, by this pretended mortgage, a legal estate vested in them, they have no standing in court whereby they can sustain this bill. They can only be made trustees of the bondholders, by force of having the legal title vested in them ;—the *cestui que trust* having the equitable interest, and the right of actual possession, and the control of the legal title, in case it had been vested in the trustees by force of the mortgage. One object of the bill is to create them trustees by reforming the instrument ; and until that is done, they have nothing to stand on ; and, of course, at the institution of the suit, they were without right. Until they were vested with the legal title, they stood as strangers. The bondholders are the only persons in interest in the establishment of the trust. The orators have no interest in it. In suits by or against strangers, the general rule is that all trustees and *cestuis que trust*, who together constitute but one interest, must be made parties. *Byfield* v. *Taylor*, 1 Moll. 198 ; *Adams* v. *St. Legere*, B. & B. 184 ; *Lewin* 657. We think it is true ; in case of an executory contract, to convey to one person for the use of another, both must be made parties. *Cope* v. *Parry*, 2 J. & W. 538 ; *Hobson* v. *Staneer*, 9 Mad. 83. So a mortgagee can not foreclose without making all the *cestuis que trust* claiming under the mortgagor, parties. *Calverley* v. *Phelps*, 6 Mad. 229 ; *Wilton* v. *Jones*, 2 Y. & C. Ch. Cases, 244 ; *Thomas* v. *Dunning*, 5 De Gex & Sm. 618 ; *Anderson* v. *Stather*, 2 Coll. 209 ; *Lewin*, 658.

XII. Our next proposition is, that this instrument could not be rectified upon the present bill, if by any supposed possi-

bility the orators were entitled to a rectification of it. In such a case, the bill must set out particularly, positively and affirmatively, the defects in the instrument to be rectified, and wherein it is to be rectified. Story's Equity Pl., sec 249, 257, 264 ; 26 Connecticut, 16 ; *Fonley* v. Bryant, 32 Maine, 483 ; 5 Mason's Rep.

*E. J. Phelps,* also for the defendant trustees.

I. The corporation had no power to execute the mortgage in dispute. It is therefore *ultra vires,* and void.

1. No such power is conferred by the charter.

2. Nor by any general statute in existence when the mortgage was made.

(a.) The provisions of the Compiled Statutes, concerning the conveyance of real estate, adopted long before railroads were invented, has no possible reference to such a case as this. The franchise sought to be conveyed by this mortgage is not real estate, nor was that statute ever claimed to be applicable to a franchise. And the easement in the road way occupied by the Company, though in one sense real estate, they have not the right to convey, except by express consent of the Legislature. It is not their private property. They hold it only in trust for the state, by whose right of eminent domain it was acquired for public use. Their occupation is inseparable from their franchise, which is not assignable, and if separated, the land reverts to its original proprietors. *Hill* v. *The Western Vt. Railroad Co.,* 32 Vt. 77.

(b.) The Act of 9th November, 1850, under which all other railroad mortgages in this state have been executed, was subsequent to this mortgage, which bears date and was recorded June 26, 1850.

The suggestion that the bonds were not issued until after the passage of that act, is untrue in fact. They are to be taken as delivered at the time they bear date, and from which interest runs, (July 1, 1850,) until the contrary is shown. The contrary is not shown, unless by the statement of Bradley of what appears in the books. The books are not evidence, and much

less Bradley's statement of their contents. It is not denied that the bonds were delivered *to the trustees* by the 1st of July, 1850. By the contract with Wilson & Co., (Ex. 9,) dated June 1, 1850, one thousand tons of iron, *previously* delivered by them, were to be paid for in these bonds, as well as other iron as fast as thereafter delivered. Much more iron was delivered under that contract, between its date and the passage of the act in question.

If, therefore, the bonds were not actually delivered to Wilson & Co., prior to the passage of the act, (a fact left in doubt by the evidence,) they were held by the trustees *for* Wilson & Co., who could have compelled their delivery in pursuance of the contract.

And further, the bonds, whenever delivered, were always treated as operative from date, and interest was allowed and paid accordingly. All subsequent deliveries had, and were intended to have, relation back to the first issue. But even if the bonds were issued after the passage of the act, the complainants are not aided. It is the validity of the mortgage that is in question. That was complete when recorded. Subsequent legislation could neither add to nor diminish its effect. If void when executed, it is void always. Nor does the act profess to refer at all to past transactions. Nor was any action whatever taken by either directors or stockholders, subsequent to the passage of the act, by which any new force or effect was attempted to be given to the existing mortgage. It is clear therefore, upon all grounds, that the mortgage must stand, if at all, without aid from the act of 9th November, 1850.

3. A corporation possesses no powers except those expressly conferred by general or special enactment, except the powers necessarily incident to those so expressly conferred. *Vt. and Can. R. R. Co.* v. *Vt. Cen. R. R. Co.*, Vt. Sup. Ct., Jan., 1861.

4. The power to alienate either the franchise of the company, or the right of way, is not an incident to the powers conferred by the charter. No power so novel and so important, can be derived by implication.

*As to the franchise.* A franchise is not negotiable. Its privileges are special and personal, and are granted for the public good. *To*

*whom* they shall be granted, is a question of the first importance. Neither the powers nor the duties arising from them, can be delegated by the grantees, without the assent of government. Every consideration of public policy forbids.

Could a banking franchise be sold by its corporation? Much less that of a railway company.

That such a franchise is not assignable, is effectually settled by authority, English and American. The following cases are in point; Redfield on Railw., p. 576, and notes. *Winch* v. *Railway Co.,* 13 Eng. L. & E. 506; *McGregor* v. *Deal & Dover R. Co.,* 16 Eng. L. & E. 180; *S. Y. R. Co.* v. *Great N. R. Co.,* 19 Eng. L. & E. 513; *S. & B. R. Co.* v. *L. & N. W. R. Co.,* 21 Eng. L. & E. 319; *Great N. Co's R. Co.* v. *Ers. Co's R. Co.,* 9 Hare 313; *Shrewsbury & Ch. R. Co.* v. *Shrewsbury & Bir. R. Co.,* 1 Sim. N. S. 110; *East Anglian R. Co.* v. *Eas. Co's R. Co.,* 11 C. B. 775; *London S. W. R. Co.* v. *L. Easterly R. Co.,* 8 Exch. 584; *Ware* v. *Grand Junc. Water Co.,* 2 N. & Mylne 470; *Coe.* v. *Columbus Piqua & Ind. R. Co.,* 10 Ohio (N. S.) 372; *Pierce* v. *Emery,* 32 N. Hamp. 484; *Troy & Rut. R. Co.* v. *Kerr,* 17 Barb. 58; *State* v. *Kerr,* 5 Iredell, N. C., 297; *Winchester & Lex. T. Co.* v. *Vimont,* 5 B. Monroe 1; *Vt. & Can. R. Co.* v. *Vt. Cen. R. Co., supra.*

Nor can the franchise be regarded as divisible. The charter confers but one franchise for a single and indivisible purpose. Except for that purpose the corporation have no power of existence. " The franchise of being a corporation for one general purpose, as to erect and make profit from a turnpike, comes quite plainly within the doctrine that denies that a franchise is divisible. *The People* v. *B. & R. Turnpike Co.,* 23 Wend. 223.

*As to the road.* The corporation have but an easement for a special purpose. They can not acquire more, even by deed of warranty. And when the use ceases the land reverts.

It is impossible therefore to separate the easement from the franchise, under which alone it is capable of being used. The nature of the easement precludes its transfer. The use is exclusively public. The corporation have only a right to its management and its income, in consideration of the construction and

equipment they furnish, and the obligations they assume. They must keep it in use, or surrender their privilege. And in using it, must convey the whole public, without distinction, at such times, and in such manner, at such rates, and with such safeguards, as the legislature may direct. *People* v. *Bristol & Renssalaer T. Co.*, 23 Wend. 222 and seq.

Manifestly, therefore, they acquire no such property in *the land* as enables them to sell it, in the absence of legislative authority, even in connection with their franchise, much less without it. This point is likewise settled by judicial determination. *See cases cited supra. Ammach* v. *T. Co.*, 13 Sergt. & R. 210; *Beman* v. *Hufford*, 6 Eng. Law and Eq. 106; 9 Sm. & Mar. 394 in Red. on R. 589; *Balfour* v. *Ernest*, 3 Sm. U. S. 439; *Bargate* v. *Shortbridge*, 5 House of Lords Com. 318; *Hood* v. *N. Y. & N. H. R. R. Co.*, 22 Cow. 512; *Clark* v. *Washington*, 12 Wheaton 40.

And the passage of the Act of 9th November, 1850, is of itself a conclusive proof of the general understanding, that without such provision no power would exist in a railway company to mortgage its franchise and easement.

5. The suggestion that the mortgage, though *ultra vires*, is still binding upon the corporation, and upon subsequent purchasers, hardly requires notice.

Nothing is better settled than that the contract of a corporation, which is *ultra vires*, is always and necessarily void. *Vt. & Can. R. R. Co.* v. *Vt. & Cen. R. R. Co.*, *supra;* *Sturges et al.* v. *Knapp et al.*, 31 Vt. 54; *Mech. Bank* v. *N. H. R. R. Co.*, 3 Kern. 599; Red. on Railways 438, and cases in note.

And there is in this respect a clear and well recognized distinction between a contract that is outside and beyond the corporate powers, and one that in the attempted exercise of a corporate power, merely transcends the limits or regulations which the charter prescribes. *Farmers' Bank* v. *Burchard*, 33 Vt. 346.

The result of a contrary doctrine would be to confer on every corporation powers as unlimited as those of a natural person, so long as the state did not interfere to revoke the charter.

II. If the corporation had the power to mortgage, the di-

rectors could not exercise it without the special authority of the stockholders.

The discretionary authority of directors is confined to the ordinary corporate business. It never was allowed to extend to a transaction so important and so extraordinary as the alienation of their entire franchise and property.

III. The mortgage is not legally executed as the deed of the corporation. It is the deed of Clark, and not of the corporation. *Isham Adm'r.* v. *Bennington Iron Co.*, 19 Vt. 230.

IV. It cannot be set up in equity, as against subsequent incumbrancers for value, unless they had notice of its existence before their own rights accrued.

V. No such notice is shown.

1. The record of the mortgage is not notice. The registry of a defective deed never constitutes notice. *Isham* v. *Ben. Iron Co.*, *supra*.

2. Notice to the trustees is not sufficient. No agency existed between them and the buyers of bonds.

In the origin of the transaction, the trustees merely agreed with the corporation to hold the mortgage title for the benefit of those who might thereafter become purchasers of the bonds. The sale of the bonds was conducted exclusively by the corporation. The trustees were not parties to it, and had nothing to do with it. They were in no sense the agents or representatives of purchasers in buying the bonds. Nor did any relation at all arise between them, until the purchase was contemplated, and buyers had by contract with the corporation become bondholders. Then, and not till then, a trust arose in the trustees in behalf of bondholders, the duties of which they were bound to perform.

An agency between the trustees and the purchasers, in the matter of making the purchase, could only be created by some contract, to which both were parties.

And the principal could only be charged with notices of what the agent was bound to communicate.

Could any bondholder maintain the action against the trustees, for neglect of duty as his agents, in failing to inform him of the existence of a prior mortgage, while he was purchasing bonds in ignorance of it?

This point is expressly decided in the recent important and very thoroughly considered case, in the New York court of appeals, of *Curtis et als.* v. *Leavitt,* receiver, &c., 15 N. Y. p. 174, 194–5, 258.

And should this court adopt a different rule, the singular instance in the conflict of laws would be presented, of the same mortgage, covering a railroad extending both sides of the State line, being held void in one State and valid in the other.

Though the law of New York does not necessarily control the case, yet in view of the situation of the road, and the importance of a concurrence of decision, and in consideration further, that the bonds were made payable and negotiated in New York, are mainly owned there, and that all parties contemplated that New York should be the real *locus contractus,* grave reasons should certainly be brought forward, before we depart from the course of decisions already adopted by the highest court of that state, upon so great consideration.

3. Notice to the trustees is not proved.

Notice to Miller, one of the trustees, is not notice to the others. Nor is it notice to the principals, without notice to the others. And notice to the others is expressly denied in their answers and depositions, which are not overcome by the complainant's proof. The circumstances in evidence strongly sustain them.

The clearest proof is requisite, when an invalid contract is sought to be set up in equity against third parties.

4. If notice to the trustees is to be deemed notice to the bondholders, and the complainant's evidence on that subject is to prevail, the facts thus established are in substance these:

That Messrs. Corning and Sherman, trustees, were informed of the existence of a prior mortgage: That they declined to accept the mortgage offered them, unless the former one could be retired, and theirs made a first lien. That the agents of the corporation assented to this, and agreed to retire the first mortgage with the avails of the second, so that the second mortgage should become the first, from its inception. That they did accordingly place in the hands of Mr. Miller, a trustee of the

first mortgage, bonds to a sufficient amount to pay it off, which were accepted and received by Mr Miller for that purpose. Though subsequently and without the knowledge of the second mortgage trustees, they were otherwise applied.

The notice then to Corning and Sherman amounted to this: That there *had been* a prior mortgage, which was to be *and was in fact* retired by actual payment, before the second mortgage became available, and by the issue of that mortgage itself. The payment being made within their own knowledge.

And relying upon this, they accepted the security which they had otherwise declined.

If this payment, thus made, had not afterwards been taken back, the first mortgage would have remained cancelled. While Mr. Miller held the bonds, which it is conceded were sufficient in amount, and readily convertible into money in the market, and which he had accepted and agreed to convert and apply, the mortgage was, at least in equity, paid. Only the subsequent withdrawal of the payment could revive it, as between the parties to it even. And this took place after the second mortgagees acquired their title, and without their knowledge or assent in any way.

The same notice therefore, that apprised Corning and Sherman of the existence of the first mortgage, also apprised them (as the truth was) that bonds were deposited with the trustee of that mortgage to meet it.

It follows that even if the first mortgage had been valid in execution and duly recorded, it could not have been set up as against the second mortgage, under the circumstances.

Far less, when invalid in law, and standing upon no other notice than this, can it be established in equity over a valid security of equal equity.

Nor will it be denied, Mr. Miller was in this transaction, the agent of the mortgagees for whom he was trustee. That mortgage, so far as it had any validity, was complete, and the bonds under it issued and disposed of. The agency of the trustees for the bondholders under it had fully commenced, and if it be held Corning and Sherman were agents for bondholders under the

second mortgage in the negotiation for the purchase of their bonds, and before they became purchasers at all, so as to charge them with the consequences of a prior mortgage ; much more must Mr. Miller be regarded as the agent of *his* bondholders, after their title had accrued and the security in his hands had attached for their benefit.

5. No attempt is made to show notice to the bondholders, personally, at the time they acquired their bonds.

It is apparent, from the whole testimony, that they purchased under the assurance and belief that theirs was a first mortgage.

Or if not, that it was to be made so, by a deposit of enough of its proceeds with Mr. Miller, to enable him to retire the prior incumbrance ; which deposit was actually made.

And the contest in the present case, is not with the corporation, but between the complainants and other creditors, prior in law, equal in merit and equity, and greater in amount.

BARRETT, J. Had the *corporation* legal competency to pledge its credit for the procurement of rails for its road, and to secure payment by a mortgage?

It is now to be regarded as settled beyond any proper ground of question, that a corporation may contract debts necessary for the due accomplishment of the purposes of its creation, and may give valid security for their payment by pledge or mortgage of any property, or interests in property, that are subject to its disposal, by virtue of the implied power existing in it, and without any express provision of statute to that effect, provided it be not restricted by statute in this respect. The case of the *Vermont and Canada R. R. Company* v. *Vermont Central R. R. Company et al.*, referred to in the argument, does not fall within this proposition ; for in that case, the transaction in question was a contract of leasing upon stipulated rent, and of security for the payment of the rent ; a transaction not within either the express or implied powers of the two corporations, till made so by statute. In the present case the end and purpose of the creation of the corporation, was the making and operating of a rail road. It was necessary to such end and purpose that the company should

31

have rails as well as a road way.    It was competent for it to contract for their purchase, and to provide by proper means for the payment therefor.    If it had not the money, it was competent to obtain a credit upon the pledge of its disposable rights and interests in property.

The rails were purchased in due course of business, and the obligations, called bonds, of the company were made and delivered in payment, purporting to be secured by a mortgage upon the road and its franchises.    And this was done in pursuance of an agreement on the part of the company that the bonds should be so secured, and they were received upon the assurance, made by the representative agents of the company, that they were so secured, by an instrument designed to be executed in pursuance of a vote of the directors authorizing the issuing of the bonds and securing them by mortgage, and authorizing the president, as agent of the company, to make such mortgage, accompanied with the opinion of eminent legal counsel that said instrument was valid as a mortgage of the corporation.

It is satisfactorily established by the evidence that the directors, with the knowledge and concurrence of all the stockholders, designed that the mortgage of the corporation should be given, and that Mr. Clark, the president, designed, in executing his agency in that behalf, to make and execute a mortgage which should be the deed of the corporation.    It is also established that the corporation had no money, and no means otherwise, wherewith to pay for, or secure the payment for the rails.    The rails thus procured were used by the corporation in the completion of its road.

The intervention of the contracts for the completed construction of the road, including the rails, with the modification of them as shown by the proofs, does not vary the legal or equitable aspect of the case, upon the question of the security claimed to have been created by the corporation for the bonds first issued.

In the transaction of negotiating for the rails and other like things, and providing for the payment, the corporation would act through the board of directors, as matter of course, under the express terms of section 6 of the charter, that " five directors

shall form a board who shall be competent to transact all the business of the company," &c. See *Bank of Middlebury* v. *R. & W. R. R. Co. et als*, 30 Vt., 159.

There is no question as to the legal formality with which the directors acted in the present case. If however, it was to be held, that for validity, the acts of the directors in this behalf must depend on authority conferred by the corporation, we find ample ground and reason for holding such authority to have been conferred, in the fact of the knowledge and concurrence of the stockholders in all that transpired, while the matter of issuing and securing the bonds was in progress, and in the fact of ratification by repeated acts afterwards; especially by what occurred at the meetings of stockholders in 1851 and in 1852, when the directors made their annual reports; as well as by what occurred in connection with, and as part of the transaction of making the second mortgage in the latter-part of the year 1852, and the lease to Mr. Canfield in 1853, and a third mortgage in 1855; in all which the existence of the first mortgage, and of the bonds secured by it, was recognized and in no way repudiated by the corporation. The principle is unquestionably sound, as stated in Red. on Railways, 575 pl. 11, that, "when the company receive the benefit of the money borrowed, they cannot avoid liability upon the mortgage given to secure its payment by denying the authority of those who contracted the loan on their behalf"; and the pertinency of its application to the present point is obvious. *Noyes* v. *R. & B. R. R. Co.*, 27 Vt., 110.

In *Curtis and others* v. *Leavitt*, 15 N. Y. p. 47, the language of COMSTOCK, J., is to the same effect:—" when a person receives and appropriates the proceeds of a transaction done in his name and by his assumed authority, there exists the highest possible evidence of his approval. "These rules are elementary, and are grounded on the simplest ideas of justice in the dealings of men. They are also as plainly applicable to corporate as to other transactions, where the dealing is *within the powers of the corporation*. In such a case no possible reason can be suggested why a corporate, as well as a private principal is not bound by the dealings of its agent, which it has approved, and the benefit

of which it has received and appropriated." On page 49 he says : " But corporations themselves, like other principals, may act and be bound in any of the modes, not opposed to the general rules of law, applicable to such bodies. They may previously resolve—they may subsequently acquiesce—they may expressly ratify—they may intentionally receive and appropriate the proceeds of the unauthorized transaction, and so put it out of their power to dispute its validity."

BROWN, J., on p. 136–7–8, expresses the same views.

It is understood of course, that this could be applicable only in case of transactions such as the corporation could lawfully become a party to, and not to transactions in violation of corporate rights and duties, such as would be void, and could impose no liability.

If it were doubtful whether the corporation had the right, in virtue of its inherent capacity, to issue the bonds. and make security for them by way of mortgage, we think that the act passed Nov. 9, 1850, should be regarded as operative to confer the right, and as effective upon the transaction in question. Section 1 of that act is : "Every railroad corporation within the state shall have power to issue notes or bonds for the purpose of building or furnishing their roads, or paying any debts contracted for building or furnishing the same, bearing such a rate of interest, not exceeding seven per cent., and secured in such manner as they may deem expedient."

It is true that the vote of the directors, authorizing and providing for the issuing of the bonds and the making of the mortgage, and the execution of the instrument by Mr. Clark as President and agent, were prior to the passage of the act. But we find from the evidence that the bonds were not issued so as to become operative and obligatory as contracts upon the corporation, till the month of February next after. Of course the security did not become operative till the debt had existence. It was but an incident of the debt, and was of no force or effect till the delivery of the bonds.

It must be assumed as beyond doubt, that the transaction, by the authorized agents of the corporation, of delivering these

bonds thus secured, in payment for the rails and for their trans-
portation, was regarded by the corporation to be warranted by
lawful authority, either as existing inherently in the corporation,
or as conferred upon it by the legislature ; and if it was so by
either means, neither the corporation, nor any one standing on
rights subsequently derived from it, can impeach the validity of
the transaction, in this respect.

The question then arises, is the instrument executed by Mr.
Clark, in pursuance of the votes of the directors, to be regarded
as the deed of the corporation? As to this, we think the
authorities firmly establish the negative. Though it was designed
by him as such agent, as well as by the directors in voting the
mortgage to be made, that it should be the deed of the corpora-
tion, and though that design is fully evinced by the face of the
instrument itself, still it is affected with technical defects in form
and mode, that prevent it from being, in contemplation of law,
the deed of the corporation. The authorities cited by the counsel
for the defendants are uniform and conclusive on this point, and
are not met or countervailed by the books and cases cited by the
counsel for the orators. This being so, the recording of the
instrument did not constitute constructive notice of its existence
and contents.

The next question is, can the orators stand in a court of equity
on the ground that the transaction, as it was, operates in their
favor as an *equitable mortgage*, to the intents and purposes designed,
but which failed of being accomplished, by the instrument that
was executed?

As between the mortgagees and the corporation, and aside from
any technical impediments, the ordinary sense of justice would
at once prompt on affirmative answer. The corporation and its
administrative agents designed to make a valid instrument of
security on the part of the corporation, and supposed they had
done so. They issued the bonds in payment for, and obtained
the rails upon that design and supposition. The rails were
sold and delivered, and the bonds were received in payment, upon
the same supposition, and with what seemed a most reliable
assurance that it was verily true and well founded. The rails

were used by the corporation in the completion of its road, thus, at the same time, incorporating into it an indispensable element of construction, and adding so much to its value as property, and for use, in carrying into effect the end and purpose of its existence.

Assuming, then, that the corporation had the power to issue the bonds and secure them by a mortgage, and that the directors were the proper agents of the corporation in this behalf, and that their acts to this intent were lawfully authorized, how are these acts, including what was done by Mr. Clark, to be regarded, in connection with the fact that the corporation has received and and used the rails, as giving the orator an equitable right to the designed security?

It seems to us that the contract was one which the *corporation* was bound by,—that is, the bonds are obligatory as a debt against the corporation; and that the contract as to the security is equally obligatory, unless some technical impediment intervenes.

Wherefore it is insisted that the statute of frauds has not been answered by what was done. Waiving any discussion of the question as to the effect of the delivery, and receipt, and use of rails, and the delivery of the bonds in payment, under the contract that they were to be secured by a mortgage, we regard the action of the directors, by their formal and recorded votes, as tantamount to a memorandum in writing sufficient to answer the requirements of the statute. It constitutes evidence of the highest character, as against the corporation of the agreement to give the designed security. We also regard the deed itself, that was executed by Clark, taken in the light of the recitals, as also evidence of the highest character as to the contract to give such security. It is true that by the strict rules of law, this instrument is not to be regarded as the deed of the corporation. If it were so to be regarded, the orators would stand upon a technical and valid mortgage at law. But that it is not so, is because it lacks efficacy to convey the *legal* estate,—not by reason of any want of power in the corporation, nor for any want of authority in Clark, nor for any want of intention on the part of the cor-

poration, or of Clark to make an instrument that should convey the legal estate ; but merely because Clark mistook the proper technical formalities and mode of making such an instrument. We do not fully apprehend the ground or purpose of the remark, that " the private intention of Clark to make a mortgage against the company is of no avail, if it cannot be carried out by the rules of law." If it be meant that the mortgage, failing as to its technical sufficiency to constitue at law a valid mortgage against the company, is of no avail for any purpose, we think it unfounded in principle, and not sustained by authority. If it be meant that the act of Clark, merely in pursuance of his private intention, would not affect the company, we assent to it ; but this does not meet the point ;—for it appears on the face of the instrument, in connection with the votes of the directors, that he was authorized to make a mortgage that should technically convey the estate,—that his agency in that behalf was for that very purpose, and that, in what he did, his design was to accomplish the purpose of his agency. We think " this intent is so manifested as to give it *legal validity*," in the language of the brief— not as a technical mortgage, operative to convey the legal estate ; but as evidence in writing as to the contract, that at the same time answers the requirements of the statute of frauds, and furnishes ground for asserting an *equitable* right in and to the security contracted to be given. The case differs widely from that cited from Ambler, 495, to sustain the position that Clark's agency was ministerial and must be strictly pursued, and unless he in fact made a mortgage valid in every technical requirement, what he did is of no effect, even as evidence, to affect the equitable rights and duties of the parties. In that case the agent was empowered to sell at *auction*, but in fact, sold at *private* sale, thus departing entirely from the *scope* of his agency. In this case Clark was authorized to make a mortgage, valid in law to convey the legal estate. Acting within the scope of his agency, he came short of doing so, by reason of mistake as to certain technical requisites. Though he thus came short of accomplishing the purposes of his agency, it would require a new rule both at law and in equity, to hold as nugatory, to every intent, what he thus did, even as matter of evidence.

In what is thus said, it is apparent that the case of *Parish* v. *Koons*, 1 Pars. Eq. Rep. 89—furnished to the court in manuscript —is not applicable to the present, on the point of the authorization of the agent, to make in behalf of his principal, such a note or memorandum in writing as is required by the statute of frauds. In that case, there was a mere parol authorization, and it was held to be invalid under the statute of frauds. In connection with these remarks, it is appropriate to observe, that the court do not adopt the views of counsel in making another point, viz : that " this, being clearly the sole private contract of Clark, cannot be controlled by *parol* in equity any more than at law, unless upon the ground of fraud or mistake." We think that the contract was that of the corporation, but the instrument was so drawn and executed as, technically, not to render it operative in the specific character of a *legal* mortgage of the corporation. This was owing, not to any mistake on the part of the corporation as to matter of law, — for they intended, and fully authorized Clark, to make a valid technical mortgage, but owing wholly to a mistake on the part of the agent of the company as to the mode of adequately executing his agency. The corporation intended he should make an instrument that should be *technically* their deed. He, by mistake, made one that, technically could operate only as *his* deed. The corporation, as such, did not pass judgment upon the legal quality of the instrument. The agent, under the authority conferred, executed and delivered it. This we regard, not as a mistake in matter of law by the corporation, as to the meaning and operation of the instrument that was executed and delivered ; but as a failure on the part of the agent adequately to perform the office and purpose for which he was appointed. Hence we have no occasion to discuss the question, whether for mistake in matter of law, a court of equity will grant relief. In this connection it is to be further remarked, in view of what we have already said, that this is not, in our apprehension, a case in which "the court is called on, to reform a written instrument, upon *parol* evidence merely, on the ground of a mistake, and thereby to repeal the statue." As before said, we think the face of the instrument itself shows

clearly that it was the design to make it the deed of the *corporation;* and all the recorded proceedings of the directors in this behalf, in pursuance of and to carry out which, the instrument was made, show clearly the same thing. The instrument and these recorded proceedings constitute reliable *criteria* whereby to determine in what respects, and to what intent, the instrument should be reformed, if such reformation is necessary as a means of enabling the orators to secure their rights through the intervention of the court in this respect. It also gives point and application to ancillary *parol* evidence, in such a manner as to preclude the hazard of being misled by it.

In pursuance, and as the result of these views, it is clear upon familiar and unquestioned principles, illustrated by very many adjudged cases, that as between the corporation and the orators, the transaction, as found by the court, entitles the orators, in equity, to have the security, which it was within the power of the corporation to give by virtue of the proposed mortgage,—that it constituted an *equitable mortgage* to the same intents as a mortgage answering the technical requirements of the law.

It is now to be considered how the rights of the orators stand in relation to the second and third mortgages.

We assume, for the present, that subsequent grantees take and hold the estate conveyed, subject not only to all *legal* incumbrances to which it was subject in the hands of the grantor, but to all equitable incumbrances of which they have notice. A case in point, as propounding and applying the principle is, *Sumner* v. *Rhodes,* 14 Conn. 134.

The court are convinced by the evidence, that all the trustees under the second and third mortgages, prior to and at the time such mortgages were executed and they became trustees, had notice and knowledge, in point of fact, that the first bonds had been issued, and that the same were secured by mortgage. All the circumstances and reasonable probabilities concur with the direct evidence, and leave no reasonable doubt of the fact. This being so, they stand chargeable with the legitimate effect of the right, whether legal or equitable, which existed in virtue of the

issuing of the said bonds with such security by way of mortgage as appertained to them; and that too, even though it were to be held, that the validity of that security depended upon acts of the corporation prior to the making of said second and third mortgages, by way of recognizing and ratifying the act of the directors in the transaction constituting the creation of the security, and even though the trustees under said mortgages had not, in fact, knowledge of those acts.

When they had notice and knowledge of the issuing and existence of the bonds, and of their being secured by mortgage, if the fact existed, it had full operation and effect to subject the title which they took with such notice and knowledge, to the legitimate consequences of that fact.

The bonds, immediately upon being issued, having been received in payment for the rails, thereby became effective in the hands of the holders, with the fixed right in them to the security provided in that behalf; and it was not in the power of the corporation or of any of its officers, without the concurrence of such holders, to divest or affect that right by any act of theirs thereafter; so that, whatever was said or done by, or in behalf of the corporation, through its officers, in respect to other bonds and mortgages as affecting the rights of the holders of the first bonds, or by way of making other provisions for the debt evidenced thereby, was entirely nugatory as against the holders of said first bonds. They stood upon fixed and vested rights, over which the corporation had no control, except by paying said bonds. It makes no difference, as to the rights of said bondholders, what provision was made in this respect, either by means of, or under, the second or third mortgage, or whether the corporation, or its officers, acted in good faith or not in making or administering such provision.

It is now to be considered how such notice and knowledge on the part of the trustees under the second and third mortgages affect the title they hold, in view of the relation they sustain to the bondholders under said mortgages respectively.

In *Pierce* v. *Emery*, 32 N. H., p. 521, CH. J. PERLEY says:— "Notice to Trustees, who take a conveyance for the mere pur-

" pose of upholding an estate, without having any previous
" connexion with the title, is not always, nor perhaps usually
" regarded as notice to the *cestuis que trust*. But the trustees
" under this act must be considered in the light of agents for the
" negotiating of the loan; they act for those who lend their
" money on the security of the mortgage; they are charged with
" the duty of protecting the interests of the bondholders, who
" are unconnected individuals, having no ready means of acting
" together except through the trustees, whom the law appoints
" to act for them. Notice to the trustees would be all that could
" be given in this case."

It is well settled, as is said in Hill on Trustees, 513, that,
" Notice, either actual or constructive, will. be equally binding,
" whether it be given to the purchaser himself, or to a person
" acting as his agent, or solicitor, or counsel."

We think, both upon principle, and from due regard to what
alone is practicable in such cases, that notice to the trustees
should be held to affect the title in their hands with reference to
all rights existing in respect thereto under the trust. Though it
is obvious and readily conceded, that bondholders acquire their
rights, in reference to the security provided by the mortgage in
trust, by the purchase of the bonds, and with such purchase the
trustees have no connexion, nor any agency in reference to the
transfer thereof, yet it is at the same time true, that, in reference
to the security, for holding, enforcing and administering it ac-
cording to the provisions of the trust, the trustees are the agents
of the parties interested and entitled by reason of being bond-
holders. We are unable to assent to the proposition, that the
trustees are only agents of the *cestuis que trust* for holding the
*legal title.* They are agents for holding just such title as is
created by the transaction, and for administering it according to
the terms of the trust; and whatever title the *cestui que trust*
have, whether legal or equitable, is through, and in virtue of,
the title conveyed to, and held by the trustees. Even if it
should be granted that the trustees were agents merely for holding
the *legal* title, still, as the rights of the *cestuis que trust* depend
upon, and are to be asserted through that legal title, whatever

affects such legal title in its creation in the trustees, must affect
the rights and interests that are dependent upon 'it. If the
legal title is charged with an incumbrance in its creation in the
hands of the trustees, it is difficult to see how the *cestuis que trust*
can have an equity suspended upon that legal title that shall
override such incumbrance. However that might be as a proposi-
tion applicable to a *dry trust*, still, as to a trust, which in addition
to the holding of the title, is administrative of the property for the
purpose of effectuating the security, the trustees must be regarded
sa the agents of the *cestuis que trust* with reference to all their rights
and interests, both in the title held, and in the administration
and fruits of the trust, according to its terms and legal opera-
tion." In *Sturgis and Douglas* v. *Knapp et als.*, 31 Vt., 34, it
was held that a mortgage by railrord company, where the
only trust expressed was, to hold the property to secure the
payment of the bonds named, created an active, administrative
trust, even after a foreclosure, under which the trustees were
authorized to make a lease of the road and property for ten
years, against the protest and remonstrance of a large majority
in amount of the bondholders; though contrary to my own
opinion. But it is the adjudicated law of the subject in this
state. In the present case, however, the second and third mort-
gages provide specifically, and in detail, for the administra-
tion of the property, after the condition shall have been broken,
for the satisfaction of the rights and interests of the bondholders
under said mortgage. The fact that the bonds are treated as
negotiable, and pass from hand to hand like bank bills, does not
affect the question of the agency of the trustees in reference to
the security provided by the mortgage. Such bonds purport to
be secured by a mortgage in trust to trustees who are designated
and known. They are negotiated and purchased upon the
security thus existing. That security consists in the property
and title which exist in the trustees. By the purchase of the
bonds, the purchaser voluntarily adopts the security as it exists
in the trustees, and becomes *cestui que trust* under them, thereby
adopting said trustees as his agents for holding the existing
title, and administering the property held thereby to the intents

specified in the creation of the trust. The question is not as to how *cestuis que trust* would be affected by notice to trustees of transactions subsequent to the creation of the trust, or to their becoming *cestuis* under the trust, but as to how they are affected by notice to the trustees which, as to them personally, affects the legal estate at the time, and in the act of their becoming trustees.

Then as to the practicableness of a contrary doctrine :—The very fact that the bonds pass from hand to hand, and without any record or notice, and are changing hands every day to a greater or less extent, shows that the matter of fixing an equity by notice would be practically impossible. It cannot be 'known in whose hands all, or any considerable portion of the bonds are at any given time, nor in whose hands they will be the next day, or next month. Of course notice would affect only the party to whom it was given, as there is no joint interest, or representative relation, between the different holders of the bonds. Nor would notice to a holder of specific bonds to-day affect a person who without notice should, in good faith, be the holder of the same bonds to-morrow. The result must necessarily be, that however well grounded an equity a party might have against the corporation, and against the trustees personally, attaching upon the legal title held by such trustees, it would prove barren and futile to any beneficial intent, by reason of the impossibility of knowing and notifying the ever shifting parties who have an interest, and claim an equity, subsequently created and subsequently accruing. On the other hand, it would be easy comparatively for persons, desirous of investing in railroad mortgage bonds, to apply to the trustees holding the security, and elicit the true state of the title. We think it no hardship that they should be required to do so, if they would avoid the hazard of finding their security subject to prior incumbrances, when it might be too late to save themselves from the consequences of such a state of the title.

The only case that has been cited, or that we have been able to find, in which a contrary proposition has been asserted, is *Curtis* v. *Leavitt*, 15 N. Y. Rep. Several of the judges drew up opinions. Shankland and Paige concur with Comstock

and three other of the judges in the result, that the bondholders were entitled to the securites in the hands of the trustees,—those two putting it on the ground that they were *bona fide* purchasers of the bonds, without notice of the defect in the manner in which the securities had been assigned to said trustees, one of whom knew of said defect; holding that the trustees were not agents of the bondholders, but only of the corporation making the assignment. The four other judges held the assignment itself to be valid, notwithstanding such alleged defect in the manner of making it, on the ground that it being within the scope of the power of the corporation to make such an assignment, and the corporation having received the benefits resulting from the issue and sale of the bonds, it had, by its acts of recognition and ratification, cured said alleged defect.

Judges Shankland and Paige cite no authority upon the point to sustain their view; and it was not one of the points decided in the case. The securites assigned were bonds and mortgages, to be held by the assignees, and the avails to be held and applied as security and in payment of the bonds issued by the company, in the manner provided in the instrument of assignment.

We have no occasion to present any critical analysis and discussion of that case, for the purpose of ascertaining whether the trustees and bondholders in that case sustained such a relation to each other, and to the subject matter of their respective interests, as to constitute ground for the application of the same principle and rule as the case before us. For if it did, upon the views we have expressed, we should regard the point as held by Judges Shankland and Paige unsound. But it is sufficient to say that it was not so decided in that case, and of course stands only upon the individual views of the judges named.

It is to be noticed that, in what we have said, as to the trustees being agents of the bondholders, we confine that agency to the purposes of the trust with which the trustees were clothed, viz: that of holding the title as security, and enforcing and administering such security according to the provisions of the trust, both express and by law implied. We do not hold, nor do we assent to the position taken in the argument by one of the coun-

sel for the defendants, in reference to the $250,000. of bonds under the second mortgage, put into the hands of Miller with the design of having them appropriated to the retirement of the first bonds, that the trustees have, under their trust, any agency to discharge, change or compromise the security which they hold as trustees. They are not ,general agents of the bondholders, but special, and limited to the legitimate purposes of the relation they sustain to the security and to the parties entitled, under the trust with which they are clothed. Any act or omission of theirs, therefore, whether in bad or good faith, outside the scope and purposes and legitimate incidents of the trust, would not affect other parties in their rights under the trust, on the score of the agency existing in virtue of that relation.

But it is insisted that the subsequent mortgagees cannot be subjected to the prior equitable incumbrance, unless the notice to them was such as to make it fraudulent in them to take and register said mortgages, in prejudice to the known title of the other party.

To the principle embodied in this position we have no difficulty in assenting; but we think that the impression, naturally resulting from the manner in which it is put, may not be precisely accurate.

The notice, which the law regards as effectual to charge a subsequent purchaser, is such as, if duly heeded and properly pursued, would lead to a knowledge of the true character, in point of fact, of the prior incumbrance, and thus charges him with the legal consequences of such prior incumbrance, however he may judge of the validity, in point of law, of such incumbrance, or of the legal consequences that may flow from it. By the fact of such notice, being charged with a knowledge of such incumbrance, if in fact it existed, the law regards the taking of a subsequent conveyance in prejudice to such incumbrance, as being in *bad faith* on the part of the purchaser, even though in truth he took such conveyance, either in heedless disregard of the notice, or upon the supposition that the prior claim was invalid, or in doubt whether it was valid or not, and thought best to take his chances in that respect; and not with any wish or design to

defraud anybody. Indeed, the true idea of fraud, as involved in this subject, is not so much that there is fraudulent intent on the part of the subsequent purchaser in taking the conveyance, as that, to permit it to be set up and enforced, as against the prior equitable title, would operate a fraud as against that title. This is the elemental idea of an estoppel *in pais*, in its ordinary application; to which the principle upon which a subsequent purchaser is charged by a notice of a prior equitable title is strikingly analogous, if not precisely identical with it.

The next question is, had the corporation any right or interest in the subject matter of the mortgage, upon which said mortgage could lawfully be operative?

It purports to convey "the road and its franchises; the location, survey and description of which has been duly made, &c."

It is not questioned, and is virtually conceded in the argument, that the right and interest of the corporation is so in the nature of *real estate*, or is such an interest in land, as might be the subject of conveyance in mortgage; but it is insisted that the corporation holds that right and interest so under, and in the character of, a *franchise*, in trust for the public, so as to be disentitled to make any conveyance of it.

Much was said in the argument, and much is contained in the books, as to the incompetency of a corporation to make any conveyance or transfer of its franchises, unless specially authorized to do so by act of the legislature.

It is claimed and insisted that the franchises are conferred upon a particular body of men constituting the corporation, implying a special confidence in them to answer the trusts in behalf of the public, which constitute the consideration for granting such franchises; and that it is not competent for the corporation to disable itself from holding and fulfilling those trusts, either by disposing of its franchises, or of the means necessary for the execution of such trusts.

In order to make a practical test of the soundness and value of this proposition, it seems worth the while to consider the subject with reference to its actual elements.

The end and object on the part of the public is, primarily, the

same as that on the part of the corporation, viz : the construction and operating of a railroad ; the results of which, as the next and most important object, are on the one hand, serving the public convenience and interest, and on the other, the pecuniary emolument of the corporation. The former is the consideration upon which the corporation is created, and its franchises conferred by the legislature ; the latter is the inducement which leads individuals to become members of the corporation. It is necessarily implied as being in contemplation, that the end of making and operating the road is to be attained through the use of the practicable means ordinarily resorted to in such enterprises. These are, first, money raised by subscriptions to the capital stock ; second, money and materials obtained on such credit as can be made available for the purpose. If neither of these means prove effectual, there is an end of the enterprise, both with reference to the public and the corporation. The present case is a clear illustration. The road was located and surveyed and put under contract, and was in the process of being built, by means obtained through subscriptions to the stock. It was necessary to have rails. The capital stock could not be made productive of the means of purchasing them. The only resource left was such credit as could be obtained. The only means of obtaining such credit was the pledge of such proprietary rights and interests as the corporation had ; and they consisted only of the road and its franchises. If these means could not be made available, the enterprise was doomed to stop at a stage when neither the public could derive any benefit from it, nor anybody else, and when all that had been done would be outright loss and sacrifice to everybody but the laborers who had got their pay. In this position of affairs, did public policy, did the trust for the public benefit, reposed in the corporation, as the consideration for creating it, and clothing it with its franchises, require that the enterprise should then come to an end, and the charter become forfeited?

On the other hand, looking to the purpose to be served to the public, viz : the service of the public interest by the making and operating of a railroad ; would not public policy and the

character of the trust reposed in the corporation in behalf of the public, rather require that the corporation should pledge such means as it had for a credit that would enable it to go forward with the enterprise to a successful result, in the reasonable and confident expectation of being able to redeem the pledge, and realize to the public and itself all the legitimate benefits of the undertaking?

On the subject of public policy, the legislation of 1850, of 1856, and of 1857, is quite significant. The act of 1850 authorizing railroad corporations to issue bonds, *secured in such manner as they may deem expedient,* has already been recited. In 1856 it was enacted:—" Sec. 1. All mortgages of railroad franchises, furniture, cars, engines and rolling stock of any kind when properly executed and recorded, shall be effectual to vest in the mortgagee a valid mortgage interest in and lien upon all such property without delivery or change of possession ; and for the purpose of mortgage, all such property shall be deemed part of the realty."

This is decisive that the legislature regarded it competent and proper for railroad corporations to mortgage *franchises* as well as tangible property. It is not creating a new power in such corporations, but only providing for the effectuation of a power assumed as already existing, and is clearly to be taken as additional to, and in furtherance of, the act of Nov. 9, 1850, to relieve the necessity of a change of possession, which, under the common law of the State, would be necessary in order to render security on chattels given under the act of 1850 effectual against sales and attachments.

In 1857 it was enacted,—" Sec. 1. In all cases where a mortgage of any railroad, or any part thereof, made by any railroad company in this State to secure the payment of bonds shall have been foreclosed, and the legal title to the mortgaged premises vested in the mortgagees, any number of persons holding a majority in the amount of the principal of the bonds so secured, may form themselves into a corporation for the purpose of owning or maintaining and operating such railroad," &c., providing in detail for their organization. Sec. 7 provides, in case of failure

of the bondholders to organize a new corporation, as before provided in case of foreclosure, or if the railroad on which the mortgage exists shall be sold or assigned by virtue of any order, decree or judgment of any court, the purchaser or purchasers, or grantee or grantees, shall have, take, or possess all the rights, powers and privileges before granted to a majority of the bondholders, and may become a corporation, in the manner prescribed, with all the powers, privileges and franchises, and be subject to all the duties granted to, or imposed upon, railroad corporations.

These enactments, all of weich are embodied in the General Statutes, p. 237, leave no ground for doubt as to public policy as bearing on the subject in hand.

But, it is said, if the corporation is permitted to dispose of its franchises, and of its property essential to their exercise, it will disable itself from performing its obligations to the public.

It might seem to be an answer in point, that unless it is permitted so to do, it will never have any ability to perform those obligations.

But let us enquire a little into the legal and practical character of those obligations.

It is assumed by the court, that if a corporation would entitle itself to the enjoyment of its franchises, it must comply with the provisions and requirements of its charter, both express and implied, so far as its duty to the public is concerned. It must act under its charter for the accomplishment of the purposes designed by it. But it is at the option of the corporation whether it will do so or not. The only remedy in favor of the public is by a proceeding to enforce a forfeiture of the charter. The corporation cannot be compelled either to make or operate a rail road. Whether it will do so or not depends on the expectation of its being a feasible and prosperous enterprise. If it should find it to be a losing nndertaking, it would be likely to cease to prosecute it. If it should find or expect it to be a profitable one, it would be likely to continue its prosecution. If the corporation should, for prudential considerations, see fit to transfer to others its property, with the franchises appertaining to such property, the same motives would operate upon the assignees, and to the

same intents, as upon the corporation.   The assignees would
hold subject to the obligations and duties to the public which
rested upon the corporation, and, in order to take any benefit
from the assignment, would find it necessary to answer to those
obligations and duties.   The same remedy would be effectual, so
far as rights depending on the franchises of the corporation were
concerned, upon the assignees, as upon the corporation.   The
assignees could no more pervert the road-way to other uses than
could the corporation.   They could no more turn to any other
account than the operating of a railroad any of the corporate
rights and privileges, than could the corporation.   So far as
property held in absolute title is concerned, the corporation and
the assignees could equally dispose of it as they should see fit,
whether such property was essential to the operating of the rail-
road or not.   So long as the rights and privileges conferred upon
the corporation should be exercised in accomplishment of the
purposes for which they were conferred, there would seem to be
not only no occasion, but no right, on the part of the public to
interpose between the corporation and its assignees,—certainly
not by way of taking a forfeiture of the charter ; and as it seems
to us, equally none on the part of individuals, by way of ques-
tioning the validity of the assignment on the score of public
policy.

   The idea of a particular confidence reposed in the particular
persons, who compose the corporation, for the service of the
public interests involved in the making and operating of the pro-
posed rail road, seems to us altogether fanciful and theoretical.
In fact, there is no such confidence.   From the nature of the
case there could not be.   For, who shall compose the corpora-
tion at any given time, depends on who owns shares of the cap-
ital stock—one set of men to-day—another to-morrow,—some
citizens of the state—some foreigners.   The true idea is, that
the public relies, for its assurance that its rights will be duly
answered, upon the fact that they *must* be, in order that the con-
ferred privileges may be held and enjoyed by the corporation, of
whomsoever composed,—not upon any personal confidence which
the legislature has in an indiscriminate body of persons,—men,

women and children—citizens and foreigners, daily changing, who may become or cease to be stockholders at their own pleasure and without restraint.

Now to recur to the mortgage ; What does it purport to convey? The premises mentioned in the following vote. " Resolved, that Mr. Clark, the president of this company, be appointed attorney and agent, to execute a mortgage of their road and its franchise to Daniel S. Miller and Shepherd Knapp, &c. ;"—that is, such title as the corporation had, and the privilege appertaining thereto, viz : the right to the road-way, for the purpose of making and operating a railroad, as provided by the charter, with the privilege of thus making and operating it, and enjoying the emoluments thereof.

We think, upon the views thus presented, as well as in conformity to several cases adjudged by courts of the highest character, as also to the opinion of eminent juridical authors, that it should be held that the corporation was competent to convey in mortgage what the mortgage purports to cover and convey, viz : the road and its franchise, as now construed. See Redfield on Railways, 574–591, and cases cited in notes. See particularly note 19, and the case of *Hall et als.* v. *Sullivan Railway*, in which we think the authority of the corporation to mortgage its franchise to build, own and manage a railroad, and to take tolls thereon, is put on sound and satisfactory grounds. See also the opinion of DAVIS, J., in *Morrill et als.* v. *Noyes*, recently decided in the Supreme Court of Maine, Law Register, Nov. 1863.

It is to be noticed that the language of this mortgage, in describing the subject on which it was to operate, does not bring in question the much vexed subject of the power of a corporation to transfer its franchise of existence. It purports to convey only the " *road and its franchise ;*" which terms embrace only such rights and privileges as are involved in the owning, maintaining and operating of the railroad, and in the receipt and enjoyment of the income and emoluments of so doing. The franchise conveyed is, by the language, restricted to the franchise that the corporation had in the road itself; and therefore cannot be regarded as touching other franchises, such as that of being a

corporation, with the right of perpetual succession, of suing and being sued by corporate name, &c.

The language of BENNETT, J., in *Bank of Middlebury* v. *Edgerton et als.*, 30 Vt. 190, we adopt in word and principle, as expressing the true idea upon this subject as involved in the present case. He says :—" It is not necessary in this case that we should hold that the *franchise* to this company, to be a corporation, is a subject of sale or transfer. The right to build, own, manage and run a railroad, or take the tolls thereon, is not of necessity, of a corporate character, or dependent upon corporate rights. It may belong to and be enjoyed by natural persons, and there is nothing in its nature inconsistent with its being *assignable*,"—citing *Peter* v. *Kendall*, 6 B. & C., 703 ; Comyn's Digest, Grant, C.

It is now to be considered what constitutes the *road*, within the meaning and operation of the mortgage. This is mainly matter of construction, in the light of the character, condition and circumstances of the subject matter.

At the time the transaction took place, a road had been located between the two *termini* and put under contract, and was in the process of construction, but was in no part completed as a railroad ready for use. It could not be, that the mortgage was intended to be confined in its operation to the road in the condition in which it then was. Indeed, the very purpose of the mortgage was to enable the corporation to obtain an article of construction necessary to its completion as a railroad. It is too plain to require discussion, that it was the design of the parties, that the mortgage should take effect upon the road in its completed condition, proper and ready for use in running over it in the ordinary manner of that kind of business. And such is the legitimate import and force of the term as used.

It was not a *road*, viz. : a *railroad*, in the condition it was in at the time of making the mortgage. It was a mere *roadway* in the process of being wrought into a road. The mortgage is not of a *roadway*, or right of a roadway, or of a roadway in process of being wrought into a road,—but of " their road."

It also seems plain that the mortgage was designed to take

effect upon the road, as it should exist under the rights of the corporation, at the time the mortgagees should succeed to the rights of the corporation by virtue of the due enforcement of the mortgage.

It may be taken as granted, that, in fact, the location of the road was changed, at different points, from the place fixed upon in the original location, after the mortgage took effect, and that it has been located and constructed beyond one terminus of its location and survey as it was at that time. Still, if it is the railroad of the corporation under its charter, the whole becomes in our apprehension, subject to the mortgage. No other view is practicable without impeaching both parties of a very inadequate comprehension of the subject they were dealing with.

The value of the security depended entirely on its capability of being used as a railroad. Only by reason of its being so used would either the corporation or the mortgagees hold any right in reference to it; for the abandonment of such use would subject the rights to a forfeiture, and the land covered by the road to a reverter to the owners of the fee. This fact seems conclusive as to what was the intent of the parties, so far as the change of the location is concerned—for, to the territory covered by the abandoned location, the corporation and their assignees lost all right by the fact of abandonment.

So, too, in respect to the addition to one end of the road, the same rule applies. The idea, that two miles, more or less, of a railroad, continuous between two fixed limits, constructed in the same right, and to be used in the same right, and as part of the same road, was to be severed and held by the corporation, as against the operation and effect of the mortgage, if it exists at all, must have had its origin at a period much more recent than the mortgage now in question.

Such being regarded as the true construction of the mortgage, as to the meaning of the terms and the intent of the parties, it should be allowed to have effect accordingly, unless prevented by the intervention of some legitimate obstacle. And in this respect, it is asserted that the corporation had not acquired a right of way to a considerable part of the road at the time the

mortgage took effect, for the reason that it had not paid the land damages to the respective land owners.

It seems to be a sufficient answer to this, that any defect of title, as between the mortgagor and mortgagee, to the subject conveyed by the mortgage, is a matter for them alone to take care of; and least of all could it properly be asserted, against a right to foreclose the mortgage, either by the mortgagor or those standing upon rights under him as subsequent mortgagees.

If the land owners have not got their pay, it is for them alone to look after their rights in this behalf. If anybody has paid any of them by request of the corporation, they can assert their rights to reimbursement of the party at whose request they did it, at such time and in such way as they should be advised. If somebody has volunteered to make such payments, it will be seasonable to determine as to their rights and remedies when a proper case shall be presented for adjudication. The rights and claims of parties in respect to the road-way, that may affect the security in the hands of the mortgagees, we think can not properly be brought in question, and much less adjudicated, in this proceeding to enforce the security against parties that are subjected to it. And this view relieves us from any need in the present case, of considering and discussing the effect of the consent, shown to have been given by the land owners, to the making of the road without an appraisal and payment of the damages as a condition precedent.

In the view we have thus taken of the construction of the mortgage, there seems to be no occasion for discussing the mooted question, as to the operation of a mortgage upon subsequently acquired property, as accessory to the principal and present subject matter of the mortgage. The road, then in the process of construction, with the rights and privileges of the corporation in it as a road completed, was the thing mortgaged. The accessions to it, by way of completing it, are not susceptible of being regarded as *after-acquired property*, in the sense of the cases in which the subject has been discussed—distinct and separable from the principal thing, leaving that entire and complete, and being in themselves entire and complete; but are to be regarded as con-

stituting an incorporated and inseparable part of the one entire thing, viz., the *road.* Such being the meaning of the mortgage as to the intent and design of the parties, the operation we give to it is amply countenanced by the case of *Willich* v. *Morris Canal and Banking Company,* 3 Green's Chancery R., 377 ; by Redfield on Railways, 590, 591, and note 21, 22, 23, 24 ; by an article by the same author—Law Reg. for July, 1863, in which it is said : " The assignment of future acquisitions will not become operative at law. But in equity it is settled by a long course of decisions that such an assignment is perfectly valid and effectual, if made upon a valid consideration ;" citing several cases ꞏin England, and giving the substance of *Halroyd* v. *Marshall* recently decided by the House of Lords, and reported in 9 Jurist N. S. 213, and closing with the following remarks, viz : "This decision, resting as it does upon most unquestionable grounds of principle and authority, cannot fail to have an important bearing upon similar contracts in this country, which have been numerous both in regard to railways, and the furniture and equipment of railways, and some of which have already been determined by our courts in favor of the equitable rights of mortgagees, without seeming to comprehend very fully the equitable grounds upon which they may be made to stand. See also, *Hart* v. *F. & M. Bank,* 33 Vt. 252 ; *Pennock* v. *Coe,* 23 Howard U. S. Rep. 117, where Mr. Justice NELSON, and the counsel in argument, go into an examination and discussion of this question in all its bearings ; and the learned Judge arrives at the same just conclusion, substantially, with that already indicated as being reached by the House of Lords." See also, *Morrill* v. *Noyes,* cited *supra.*

It is to be understood that, in making these reference and quotations, nothing is to be regarded as adopted and decided in this case, beyond what is embraced and implied in giving the effect we do to the mortgage, in view of the sense and import of its terms, in their application to the subject matter.

And here it is proper to say, that we do not regard the mortgage in question, as fairly by its terms, or by any just implications, to embrace any articles of property, by way of equipment and

furnishing, not entering into and constituting a part of the structure of the road, nor being erections upon land. This would therefore, exclude from its operation, what is called rolling stock, and other personal chattels that go to make up the usual and necessary equipment and furnishing of the road, but not so affixed to the land as to partake of the character of the realty. The mortgage is silent as to any subject of conveyance but the " *road and its franchise*,"—differing in this respect from the mortgages, or other conveyances, in all the cases referred to, where they have been held operative to convey movable property subsequently acquired.

To the suggestion that the assignees can obtain and enjoy the fruits of this mortgage only in virtue of the continued existence and organization of the corporation, and the corporation, having parted with rights that are indispensable to its fulfilling the ends for which it was created, would no longer be entitled to continue, and so the end for which it was created would be defeated;—it seems sufficient to say, that whether its potential existence and its organization would continue or not, would depend on whether it should have subjected itself to a forfeiture of existence, by the failure to answer the purposes for which it was created, in the matter of its duties to the public. So long as those duties should be performed, would not the claim of the public, as well as of individuals, be fully answered? And is it to be presumed, in anticipation, that the assignees will fail to perform those duties as fully as the corporation would have done, when the same motives exist and would be operative upon the assignees as upon the corporation, and when the same remedies may be made available, both in favor of the public and of individuals, for a failure to operate the road,—viz : as to the public, a forfeiture of the rights granted by the charter, and in favor of individuals, a reverter of the land constituting the road-way?

As to the going out of the corporation by abandoning, or ceasing to keep up, its organization as a corporation under its charter, it will be in season to consider the subject, and determine the rights and remedies of the parties interested, when an occasion shall have presented itself,—having in mind, in the mean time,

the statutory provisions of 1857, still in force, for proceedings of trustees and bondholders after foreclosure. G. S. 238 and following.

We proceed now to consider the point made by the defendants,· "that if the erators have not, by this pretended mortgage, a *legal estate* vested in them, they have no standing in court whereby they can sustain this bill." To serve this proposition, it is claimed that they can only be made trustees of the bond-holders, by force of having the legal title vested in them. No case or book is cited to sustain these positions, and we do not apprehend upon what principle they can be maintained. The proposed security for the bonds was to be made by a conveyance to trustees, to hold the title, and to render the security available by such measures as the law might warrant, in case it should become necessary to enforce it. Whatever right or interest might appertain to the bond-holders in and to the security was the equitable one of *cestuis que trust*, under, and by virtue of, the title conveyed to, and vested in the trustees. Whether that title was legal or equitable, the intervention of trustees was the means by· which its ·beneficial purposes were to be made available to the bond-holders. In view of the purposes designed to be effectuated by the transaction of the attempted security of the bonds, the trustees became charged with the duty of asserting and enforcing such title as was vested in them, as a necessary means of effectuating such purposes. It would present a case of striking singularity if it should be held, because. the mortgage was *equitable* and not *legal*, that therefore, the trustees to whom it was made, were not entitled to enforce it in the character it possessed in contemplation of law, and for the ends for which it was created. In saying that "one object of the bill is to create them trustees by reforming the instrument, and until that is done, they have nothing to stand on, and of course at the institution of the suit they were without rights," it would seem to be begging the the whole question. The bill is brought to foreclose what is claimed to be an existing, enforceable and forecloseable mortgage. It sets forth all the facts upon which the claim is based. Amongst other things, it sets forth the doubt whether the instrument, as

executed, would be held for all technical purposes a legal mort-
gage, as the deed of the corporation;—and asserts that "the
orators are entitled to a decree that the same be, by the R. R.
Company, formally and solemnly executed, so that it shall at
law, and against all the defendants, be deemed to all intents and
purposes a mortgage, and as such a binding first lien and con-
veyance upon, and of the said road, property and franchise."
But no prayer is predicated upon that averment, nor is it claimed
in the closing argument of orators' counsel as a form of relief.
The bill claims a foreclosure, on the ground that the whole
transaction constitutes an equitable mortgage, to the same intents
in a court of equity, and for the purpose of enforcing the security,
as if the instrument, executed by Mr. Clark, had been the tech-
nical deed of the corporation.

Upon the familiar principle, that equity treats what is agreed
to be, and ought to be done, as done,—and following the prece-
dent of many adjudged cases, there would, for the purpose of the
suit,—viz: the enforcement of the security—be no need of a
preliminary decree for the reformation of the deed. The parties
are not, in this court, standing upon rights that can be recognized
only when they are created by a strict compliance with the tech-
nical rules of law; but upon rights which arise upon the sub-
stance and reality of the transaction, where there has been
an accidental omission to comply with some technical require-
ment.

Holding as we do, that the case stands in this court precisely
the same, for the purposes of the relief sought, as if the instru-
ment in question were the legal deed of the corporation, as mat-
ter of course, the same effect is to be given to it, in all respects
essential to the remedy to be applied, as if it were such legal
deed.

It is obvious from what has foregone, that we do not regard
the equitable right of the orators to be of so uncertain a charac-
ter, as, according to a point made by the counsel for defendants,
to render it improper for the court of equity to give it effect.
Indeed, in our view, it is in no respect uncertain. Their right
in *equity* is as well defined, and as well grounded, as their right

*at law* would have been, if the instrument executed by Clark had been the technical, valid mortgage of the corporation.    The resolutions of the directors, and the instrument made by Clark, in connection with the fact that the corporation issued the bonds for the purpose of their being used for the purchase of the rails, and that the trustees under the subsequent mortgages had notice and knowledge of all these facts, constitute a groundwork upon which the law predicates a clear and definite equity in the orators, as trustees of the security thereby created.

That the subsequent mortgagees misappreciated, and therefore doubted, the rights created by these facts, does not constitute such an uncertainty, as upon any principle, can be available to them against those rights.    This is by no means such a case as *Cordwell* v. *Mackrill*, 2 Eden 244, cited by Judge REDFIELD, in his opinion as counsel in this case ; though we assent to, and adopt the entire doctrine embodied in the language of the Lord Chancellor, in saying that, " a man must indeed take notice of a deed upon which an equity, supported by precedents, the justice of which every one acknowledges, arises ; but not the mere construction of words, which are uncertain in themselves, and the meaning of which often depends upon their location."    We also accord fully with what was said by the Master of the Rolls, 9 Ves., 588, *Barker* v. *Brooks*, viz : " In *Cordwell* v. *Mackrill*, Lord Camden doubted wether the articles should be reformed, and there may be such a doubtful equity that a purchaser is not to be taken to know what will be the decision, and that is all Lord Camden means.    But in this case the equity is clear."

Nor do we see wherein there appears to have been any negligence in the assertion of those rights.    They have on all occasions been insisted upon whenever called in question.    They have always been recognised and regarded by the corporation, and were recognised and regarded by all parties, in the transactions of making the second and third mortgages.    This suit was commenced in about one year after the first instalment of $25,000. of the principal fell due.

Moreover, it is to be remarked that the pleadings present no such ground of defence.    The defence rests on the alleged incap-

acity of the corporation to make, or become bound by, such a mortgage,—on the alleged invalidity of the instrument,—on the subsequent mortgages taken in good faith, and, as alleged, without notice of the prior mortgage ; and on the alleged lack of title in the corporation to portions of the road.

And we remark further, as to another suggestion of defendants' counsel, that we do not regard the orators as standing upon " a naked equity, against an equal equity and legal title combined." On the contrary, we regard them as standing upon a prior and superior equity, against a subsequent one depending on a legal title that was taken charged with such prior and superior equity.

Without further discussion of points, or comment upon various views and suggestions presented in the argument, sufficient has been said to develope the views and opinion of the court upon the controlling points in the case.

The ultimate conclusion is, that the orators are entitled to a decree of foreclosure, and, unless the sum, found to be due upon the bonds issued under the mortgage to them as established by this decision, is paid by the time fixed by the court of chancery for redemption, with the costs of this suit, that they are entitled to hold as trustees, upon the trust created by said mortgage, the said railroad, as against the defendants in this bill, with all and the same rights thereto for the purpose of maintaining and using the same as a railroad, that the corporation and the other defendants holding under said corporation would have, in case the mortgage to the orators should have been redeemed, in pursuance of the decree to be herein made, and unless so redeemed, that the orators are entitled to be put in possession of said road by proper process of the court of chancery, in execution of the decree of said court for such foreclosure, and that the orators recover their costs in this court, and may have execution therefor.

The decree of the chancellor is reversed, and the case remanded to the court of chancery, to ascertain in a proper way the sum due on the bonds secured by said mortgage, and to make a final decree, in conformity with this decision.